IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 11, 2011

**STATE OF TENNESSEE v. JEREMY KEETON**

**Direct Appeal from the Circuit Court for Wayne County**
**No. 14049, 14072    Stella Hargrove, Judge**

---

**No. M2009-01811-CCA-R3-CD - Filed March 8, 2011**

---

Following a change of venue, a Giles County jury convicted the Defendant of voluntary
manslaughter, and the trial court sentenced him to fifteen years in the Tennessee Department
of Correction. The Defendant appeals his conviction and sentence, claiming that the trial court
erred when it: (1) denied his request for a continuance to secure a material witness to the case;
(2) denied his request for a jury instruction on ignorance and mistake of fact; and (3) sentenced
him as a Persistent, Range III offender. After a thorough review of the record and applicable
law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J. delivered the opinion of the Court, in which DAVID H. WELLES
and JERRY L. SMITH, JJ., joined.

William M. Harris, Lawrenceburg, Tennessee, for the Appellant, Jeremy Keeton.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney
General; Michel T. Bottoms, District Attorney General; and Doug Dicus, Assistant District
Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Background**

This case arises from the shooting death of the victim, John Wesley Brewer, on July 25,
2006, while Brewer was at the Defendant's home in Wayne County, Tennessee. A grand jury
indicted the Defendant for first degree murder and felony murder. At the Defendant's trial on
these charges, the following evidence was presented: Justin Rideout, the Defendant's friend,
testified that, at the time of the victim's shooting, he had known the Defendant approximately

six months and that he had known two other men involved in this incident, Larry Clemmons and Dan Hill, for approximately two to three years. Rideout described first learning of the circumstances surrounding the victim's death, saying that, on July 24, 2006, Rideout was in Alabama at Chuck Killen's "four-wheeler" mechanic shop, which was located beside Killen's home. At approximately 10:00 p.m., the Defendant, who appeared "upset" and "mad" came into Killen's shop accompanied by another man, Van Lafevers. The Defendant asked Killen whether he knew anything about the Defendant's three-wheeler and motorcycle, which the Defendant thought had been stolen, and whether Killen had seen Clemmons and Hill. Killen responded that he knew nothing about it. Rideout recalled that there was "cussing and yelling back and forth" but the conflict was not between Killen and the Defendant. For the most part, the Defendant was "cussing" about Clemmons and Hill to Killen. The Defendant remained at the shop for fifteen or twenty minutes before leaving.

Rideout next saw the Defendant at five or six o'clock the next day, July 25, 2006, at the victim's home. The Defendant had stopped by the victim's house to invite the victim and Rideout to accompany him to Killen's to see if Killen had learned anything about the Defendant's vehicles. Rideout recalled the Defendant saying he would "hurt" or "kill" Hill and Clemmons if he found them. Both men agreed to go, and Rideout noticed a shotgun in the Defendant's truck while the men traveled to Killen's shop. When they arrived, no one was at Killen's home, so the three men left and dropped off the victim at the victim's house between six and seven o'clock. Rideout remained with the Defendant until between nine and ten o'clock when Rideout and the Defendant returned to Alabama where Rideout left the Defendant, who was carrying a shotgun, on the side of the road. The Defendant said he was going to wait in the woods and see if he could hear "them" riding his vehicles or running the engines in an attempt to find his motorcycle and three-wheeler.

After leaving the Defendant, Rideout drove back to Tennessee where he retrieved the Defendant's car and returned to pick up the Defendant where he had left him. When the Defendant got into the vehicle, it appeared he had been running because he looked tired, was out of breath, and was sweating. Rideout heard two gunshots and immediately pulled away from the location and drove back to Tennessee. The Defendant told Rideout that he had "shot up" a camper and Clemmons's car. The Defendant also said he thought he might have shot Clemmons when he shot at Clemmons's car but said he "wasn't for sure."

Upon returning to the Defendant's home, the two men began moving four-wheelers and a three-wheeler from the front of the house to the side of the house because the Defendant thought that Hill and Clemmons might be coming to the Defendant's home. The Defendant also called Lafevers and asked him for more shotgun shells. Next, the Defendant called Clemmons and said, "How did ya'll like that?" and, "Ya'll can come up here and get ya'll some more." Rideout heard Clemmons scream in response, "We're up there now and you

don't even know it!" The phone call ended and then several minutes later, the Defendant called Clemmons again "trying to [ ] smooth things over." This time the Defendant asked why Clemmons took the Defendant's motorcycle and three-wheeler and told Clemmons, "It didn't have to be all this."

Rideout recalled that Lafevers arrived at the Defendant's house with the additional shotgun shells and that, shortly thereafter, they heard a motorcycle approach the Defendant's home. Rideout said the three of them were getting "kind of freaked out" upon hearing the approaching motorcycle. Rideout ran to the back of the residence to hide in a closet while the Defendant grabbed his shotgun and ran out on the front porch. Rideout explained that he fled because he feared that Clemmons and Hill were coming to "shoot the place up."

Rideout testified that the only weapon in the house was the shotgun that the Defendant had carried with him that day. From inside the closet, Rideout heard one shot fired and then heard Lafevers say, "That was John [the victim]. It's John [the victim]." Rideout exited the closet and went outside where he saw the victim lying on the ground with a gunshot wound. The victim said, "It's me, John. What did you do that for?" Rideout ran back inside the Defendant's house and called 911. He then returned to check on the victim and, upon seeing his condition had worsened, called 911 again. This time the Defendant followed Rideout inside the house and told him to tell 911 that the victim was already shot when he arrived at the Defendant's house. Again, Rideout checked on the victim and found him non-responsive, so he called 911 a third and final time.

Prior to police or emergency personnel arriving, Lafevers left and Rideout described the Defendant as "panick[ed]" and "scared." Rideout said that he was surprised that the person riding the motorcycle turned out to be the victim, Brewer, because the victim did not regularly ride a motorcycle. Rideout stated that Hill rode a motorcycle. Rideout agreed that the victim owned a motorcycle, but it did not sound like the motorcycle the victim was riding the night of the shooting. Rideout testified that he did not see what the Defendant did with the shotgun after the shooting.

Van Lafevers, the Defendant's long-time friend, testified that before this shooting the Defendant told Lafevers he was having problems with some men in Alabama. The Defendant was angry at two men he believed had stolen his motorcycle and three-wheeler. Lafevers said that the Defendant mentioned wanting to kill Hill, but Lafevers did not think the Defendant's threat was serious.

The night of the shooting, the Defendant called Lafevers at about 12:30 a.m. and asked that Lafevers bring the Defendant shotgun shells. Lafevers brought the shells to the Defendant's home and watched as the Defendant loaded a twelve-gauge pump shotgun and

laid it on the couch. The Defendant told Lafevers that he had gone to Alabama and shot into a camper and at Clemmons's car, and thought he might have shot Clemmons, who was in the car at the time of the shooting. Lafevers, Rideout, and the Defendant were all present when they heard a motorcycle driving down the road. The Defendant picked up his shotgun and went outside, while Rideout went to the back of the house. Lafevers believed at the time that the rider of the vehicle was either Clemmons or Hill, and, in anticipation of bullets "fly[ing] through the house," he lay down on the floor. Next, Lafevers heard a single shot.

After waiting briefly, Lafevers stood up and looked out the front door. He saw someone take his helmet off, throw it across the yard, and say, "You shot me. You shot me." Once Lafevers heard the voice he recognized the motorcycle rider as the victim. The victim fell off the motorcycle, and Lafevers went to him, noting that he was still breathing and "looked fine." Lafevers recalled that the Defendant was trying to locate the gunshot wound and that Rideout called 911. The Defendant kept asking the victim why he didn't call before coming over to the Defendant's house. Lafevers went back inside the Defendant's home, retrieved the shotgun shells he had brought, and left before police or medical personnel arrived. Lafevers said he left because he did not want to be "involved in it."

On cross-examination, Lafevers said that he accompanied the Defendant to Killen's shop the night before the shooting to look for the Defendant's vehicles. The Defendant told Lafevers that he believed that Clemmons and Hill had stolen his vehicles and taken them to Killen's for Killen to work on them. Lafevers recalled that he remained in the Defendant's truck while the Defendant spoke with Killen, but he confirmed that both the victim and Rideout were at the shop at this time. After leaving Killen's, the two men drove to Clemmons's residence. It was approximately midnight when they arrived at Clemmons's trailer, but no one responded to the men knocking on the door and honking the car horn, so they returned to the Defendant's home.

Lafevers testified that, the following night when the Defendant called him and requested the shotgun shells, the Defendant expressed concern that "somebody" was going to "shoot up" his house. During this phone conversation, the Defendant did not name who he thought would shoot up his house, but, once Lafevers arrived at the Defendant's home, he told Lafevers that he believed Clemmons or Hill were either on their way to, or already in, the woods around the Defendant's house. Lafevers said that the victim owned a motorcycle but that his motorcycle did not sound like the motorcycle that he was driving the night of the shooting. Lafevers said that, although he did not know what type of motorcycle Clemmons or Hill drove, he knew that they drove motorcycles. Lafevers recalled having met Hill a few times and agreed that the victim and Hill were of similar height. Lafevers said that he knew the victim well and that he had never before seen the motorcycle the victim was driving the night of the shooting.

-4-

Larry Clemmons testified that he lived in Alabama and had known the Defendant about six or seven months at the time of this incident. Clemmons said, on a Sunday in July 2006 the Defendant bought a three-wheeler from one of Clemmons's acquaintances and asked Clemmons if he would make some repairs on the Defendant's motorcycle and also to the three-wheeler, to which Clemmons agreed. Clemmons drove the Defendant to the Defendant's house where the Defendant retrieved his motorcycle and rode it back to Clemmons's home, where Clemmons's small repair shop was located.

That day, Clemmons began tearing down the three-wheeler and found the crank broken. Clemmons realized that, because the problem was so significant, he would be unable to fix the three-wheeler. Clemmons conveyed the severity of the problem to the Defendant and told him he would need to find someone else to repair it. Clemmons recalled that on Monday morning, before he left his home for the day, the Defendant's two vehicles were in his shop but that, by Monday evening, when Clemmons returned home, they were gone. Upon finding the vehicles were gone, Clemmons assumed the Defendant had returned and taken them. Clemmons said that it was while he was away from his house on Monday, he went to Killen's shop to ask him if he wanted to buy the vehicles at the Defendant's request, but Killen was not interested. The Defendant called Clemmons on Tuesday to ask about the vehicles and Clemmons told the Defendant the vehicles were no longer in his shop. Shortly after this phone call, the Defendant arrived at Clemmons's residence to further discuss the missing vehicles. Clemmons again told the Defendant the vehicles were no longer in his shop, and the Defendant "acted like he was agitated." Clemmons testified that he did not see the Defendant again but received a phone call from him.

Clemmons testified that, on the night of July 25, 2006, he was at his cousin's house installing an air conditioner when his wife called saying she heard gunshots. Clemmons rushed home and, as he drove down the driveway, he heard a gunshot fire and strike the passenger side door of his car. Clemmons was unable to see the shooter but ascertained the shots were coming from bushes at the edge of his driveway. Clemmons drove up to his trailer, retrieved a pistol, and came back down the driveway, shooting out of his car window. As he did so, he heard two more gunshots. Clemmons said that, at the time, Hill was staying in a camper near Clemmons's house and all of this shooting occurred in the area near this camper. Later, Clemmons went down to the camper and saw that it was riddled with gunshots. Clemmons testified that he did not know who had been shooting at him at the time, but about an hour after the shooting incident, Clemmons received a phone call from the Defendant, who asked, "How [do] [you] like that?" and "[Do] [you] want to come up [] and play?" To which Clemmons responded, "Yeah, I would." Clemmons explained that he had no intention of going to the Defendant's house but that his response was intended to discourage the Defendant from returning. Clemmons testified that he made no efforts to go to the Defendant's house that night and did not request that anyone else go to the Defendant's house.

-5-

Thomas McClusky, an Alabama Sheriff's deputy, testified that he responded to a dispatch on July 25, 2006, at the Clemmons's residence. The complaint indicated that shots were fired at Clemmons's vehicle and a camper. Upon arriving, McClusky observed multiple shotgun shots into a "trailer-type" motor home and also to a Z-28 Camaro . Thirteen twelve-gauge shotgun hulls, and two wad cutters were recovered from the scene. All evidence was turned over to Investigator Steve Wilson with the Wayne County Sheriff's Office in Tennessee.

McClusky testified that, as recently as the day before his testimony, he had attempted to locate Dan Hill but was unable to find him. McClusky said that he had never spoken with Hill in connection with this investigation.

Steve Wilson, an investigator with the Wayne County Tennessee Sheriff's office at the time of the incident, testified that he proceeded to the Defendant's residence early on the morning of July 26, 2006. There, deputies recovered a twelve-gauge spent round lying a few inches from the front porch. Wilson also recovered a loaded shotgun located on the ground under the edge of a shed, close to the side of the Defendant's home. Wilson was present during an interview with the Defendant and was unaware of whether the Defendant knew the victim had died. During the interview, the Defendant asked about the victim, and Agent Jack told the Defendant the victim was dead. Wilson described the Defendant as becoming emotional and crying for a period of time. The Defendant said multiple times during the interview that "he should have killed [Clemmons and Hill] earlier last night." The Defendant said that, had he killed Clemmons and Hill, the victim would still be alive.

On cross-examination, Wilson agreed that he never found any evidence inconsistent with the Defendant's statements that he thought Hill or Clemmons was on the motorcycle. Wilson testified that he had made numerous unsuccessful attempts to locate Hill.

Don Carman, a Tennessee Bureau of Investigation ("TBI") special agent, testified as an expert witness in the field of firearms identification. After examining both the shotgun recovered from the Defendant's home and the shell recovered near the front porch, Agent Carman concluded that the spent shell was fired from the Defendant's shotgun. He also concluded that thirteen of the fourteen spent shells found at Clemmons's house were fired from the Defendant's shotgun.

Vance Jack, a TBI special agent, testified that he went to the Defendant's residence in Wayne County on July 26, 2006, based upon a homicide notification. Agent Jack testified that, during the course of the investigation, he had subpoenas issued for the Defendant's telephone records. The records indicated that eleven phone calls were placed from the Defendant's phone to Clemmons's phone between the dates of July 24 and July 26. Three of these eleven phone calls were placed on the day of the shooting, over a nine-minute time period beginning at 12:32

a.m.

As part of his investigation, Agent Jack also interviewed the Defendant on the day of the shooting and the Defendant admitted to shooting the victim in this case. The Defendant did not say anything about his trip to Alabama earlier in the evening or his involvement in shooting Clemmons's car or the camper during this interview.

Dr. Adele Maurer Lewis, a forensic pathologist, testified that she performed an autopsy on the victim's body. From the autopsy, Dr. Lewis determined the victim's cause of death was multiple gunshot wounds. Dr. Lewis said that the multiple entrance wounds were consistent with the injuries that would result from a single shot due to the pellets that are expelled when a shotgun is fired. The victim had only one fatal entry wound located on the right side of his chest. Dr. Lewis testified that her exam revealed that the projectile went through the victim's breastbone, heart, and entered his ribs causing extensive injuries to the heart and internal bleeding. She estimated that a person with these injuries would die within two or three minutes of sustaining the injury.

The Defendant testified that he first met Clemmons through a friend six months before the shooting. On July 23, 2006, the Defendant was looking to purchase a four-wheeler, so he went to Clemmons's house because Clemmons knew of some people selling four-wheelers. During the course of the Defendant's conversation with Clemmons, the Defendant also mentioned that he was interested in purchasing a three-wheeler for his son. Clemmons told the Defendant he knew someone, Nathan Hendricks, selling a three-wheeler, so the two men went to Hendricks's home to speak with him about the three-wheeler. After driving the three-wheeler, the Defendant purchased it for $1200 and drove the three-wheeler back to Clemmons's house where the Defendant had left his vehicle. About a hundred yards down the road, the motor locked up, and the Defendant could no longer drive the three-wheeler. Hendricks saw the Defendant stop and drove up to the Defendant and loaded the three-wheeler onto his truck. Hendricks told the Defendant he was disappointed the three-wheeler had "locked up" and explained that the motor had been rebuilt five months before. Hendricks suggested they have Chuck Killen, who had rebuilt the motor, look at the three-wheeler to diagnose the problem. Hendricks contacted Killen, who agreed to look at the three-wheeler but explained his shop was full. So the men agreed to take the three-wheeler to Clemmons's shop, where Killen would work on the three-wheeler.

The Defendant testified that he rode with Clemmons back to Clemmons's trailer and that, during this drive, the Defendant mentioned he was having some trouble with the gasket on his motorcycle. Clemmons offered to fix it for the Defendant, so the two men went to the Defendant's house, and the Defendant drove his motorcycle to Clemmons's house. When he arrived at Clemmons's house, Killen was already working on the Defendant's newly purchased

three-wheeler. There were several other men present at Clemmons's house on this occasion, including Dan Hill, whom the Defendant met for the first time. Before the Defendant left Clemmons's shop, he gave Killen $100 and told him that, if necessary, he would pay for any parts ordered for the three-wheeler. Clemmons told the Defendant he could pick the motorcycle up on Monday. The Defendant left Clemmons's shop at 5:00 p.m. or 6:00 p.m. on Sunday.

The Defendant denied ever telling Clemmons to try and sell either his motorcycle or the three-wheeler. At around 7:00 a.m. the next morning, the Defendant returned to Clemmons's home to retrieve his motorcycle. As he was approaching the house on the driveway, Hill stepped out from the wooded area that ran alongside the driveway and stopped the Defendant. Hill told the Defendant that he could not go to Clemmons's house because he might wake Clemmons's wife who had been up late the night before, so the Defendant turned around and drove back home. The Defendant returned to Clemmons's house that evening around 7:00 or 8:00 p.m. The Defendant asked Lafevers to ride with him so that the Defendant could drive his motorcycle home. When the two men arrived at Clemmons's trailer, no one was there and the garage door on Clemmons's shop was open. The Defendant said that he looked inside and saw that his motorcycle and three-wheeler were no longer in the shop. The Defendant recalled that he decided to go to Killen's shop because he thought that, since the three-wheeler required more extensive work, the men might have moved the Defendant's vehicles to Killen's shop.

The Defendant said that he and Lafevers went to Killen's shop, where the victim and Rideout were also present, and that, when he asked Killen about his vehicles, Killen "acted kind of offended." The Defendant did not remain long at Killen's shop but looked around to ensure his vehicles were not there. After he and Lafevers left the shop, the victim and Rideout caught up with him and stopped him along the road. As a result of the Defendant's conversation with the victim, the Defendant believed that Clemmons and Hill tried to sell his vehicles to Killen and that threats had been made toward the Defendant's home. The Defendant returned home and called Clemmons. During this phone conversation, Clemmons told the Defendant that he thought the Defendant had picked up the vehicles. The Defendant told Clemmons that he did not pick up the vehicles and that he would contact Clemmons the next day, Tuesday.

On Tuesday morning, the Defendant spoke with Clemmons over the telephone, and the two decided it might be easier to discuss the vehicles in person, so the Defendant drove to Clemmons's home. According to the Defendant, as he turned into Clemmons's driveway and began driving toward Clemmons's residence, Clemmons and Clemmons's neighbor, Doodle Atkinson, stepped out from behind a chicken house and began shooting at the Defendant's truck. Scared, the Defendant "floored the truck," drove to the end of the driveway, and turned around. He turned off the truck so that the two men would not think he was going to try to run over them. The Defendant said he could hear Atkinson saying something about slowing down as both men approached the vehicle with their guns pointed at the Defendant. The Defendant

and Clemmons again discussed the vehicles. This time Clemmons told the Defendant that a neighbor had seen some men over at his home Monday, during the day, while he himself was away. Clemmons said that he would go by these men's homes to try to locate the Defendant's vehicle. The Defendant noticed that, while Clemmons was talking, he kept glancing at the tree line for the wooded area near his house. The Defendant recalled that Clemmons seemed to be "in a rush" and told the Defendant he should go because someone might have called the police due to the gunfire. The Defendant gave Atkinson a ride back to his house and then drove to the victim's house.

At the victim's house, the Defendant found Rideout as well, and he told the two men what had occurred. Rideout and the Defendant left the victim's house and went to Lafevers's house where, once again, the Defendant explained what had occurred that day. The Defendant told Lafevers that he was going to go back after dark and look in the woods to see if he could find his vehicles. Before leaving, the Defendant took Lafevers's shotgun and a half box of shells "for protection." At around 9:00 p.m. that night, Rideout dropped the Defendant off near Clemmons's house, and the Defendant instructed Rideout to return to pick him up if the Defendant did not return home by a certain time. The Defendant hoped to find his motorcycle and drive it home. The Defendant spent about forty-five minutes looking for the vehicles but found nothing. As he searched for his vehicles, he came across a camper in the woods and shot at it between ten and fourteen times. When asked why he shot at the camper, the Defendant explained, "Greed, anger, frustration that my stuff was gone, frustration that it didn't look like I was going to get it back."

As the Defendant fled from Clemmons's home after having shot at the camper, Clemmons entered the driveway at a high rate of speed. The Defendant hid in bushes nearby and watched as Clemmons slowed his car near the camper and began shooting from his car window with a pistol. The Defendant shot at the Clemmons's car door and Clemmons sped down the driveway to his trailer. The Defendant ran across the driveway and saw Clemmons exit his trailer with a flashlight and begin shooting again. As the Defendant fled through a field toward the highway where he was to meet Rideout, he continued to see flashlights coming from behind him. Once he made it to the highway, he saw Rideout waiting for him, so he got into the car. He instructed Rideout to drive and then they heard more gunshots. The two men arrived back at the Defendant's house around 11:00 p.m.

The Defendant could not recall whether he called Clemmons or Clemmons called him, but the two men engaged in an "argumentative" phone call during which the Defendant said, "Come on up here and play some more" and Clemmons responded, "We took your stuff. There ain't nothing you can do about it. I'm coming up there to kill you and your punk buddy. We're already there watching the house." Clemmons hung up the telephone, and, after a few minutes, the Defendant called Clemmons back suggesting that Clemmons take the vehicles to a package

-9-

store and leave them for the Defendant to pick up and then agree that the men would leave each other alone. Clemmons responded, "No, you ain't getting out of it. You shot my car."

After the second phone conversation with Clemmons, the Defendant called Lafevers and asked him to bring over more shotgun shells. After Lafevers arrived with the shotgun shells, he heard a motorcycle coming down the highway. The Defendant recognized the motorcycle as one he had seen at Killen's shop. The Defendant said he did not know who was on the motorcycle, but that Rideout ran through the house yelling that it was Hill and hid in a closet while Lafevers got down on the floor. The Defendant said that he stepped outside and shot at the front of the motorcycle. The motorcycle overturned and the rider got up off the ground and said, "Damn it, man, you shot me." It was upon hearing the rider's voice that the Defendant realized it was the victim rather than Hill. The Defendant helped the victim lie down on the ground while Rideout called 911. The Defendant could hear Rideout repeatedly telling the 911 operator "I don't know who shot him." Recognizing that Rideout would not identify the Defendant as the shooter, the Defendant yelled to Rideout to tell the 911 operator that the victim was already shot when he arrived.

When the ambulance arrived, the Defendant noticed the shotgun, so he "pitched the shotgun off the side of the porch." He explained that he "wasn't concerned about nothing really" and that if he had intended to conceal the weapon he would have dropped it in a well located on his property.

The Defendant testified that his actions that night were provoked by Clemmons and that, "If it hadn't been for Larry Clemmons, [the victim] wouldn't have died that night." The Defendant denied intending to kill anyone and explained that he only intended to wreck the motorcycle. The Defendant said that he believed Hill to be the motorcycle rider approaching his house that night and reiterated that he did not intend to kill anyone and that he was "just scared."

On cross-examination, the Defendant agreed that he had previously been convicted for: felony evading arrest, felony animal fighting, two counts of reckless endangerment, manufacturing Schedule VI drugs, possession of marijuana for resale, theft, and filing a false report.

Based upon this evidence, the jury convicted the Defendant of the lesser-included offense of voluntary manslaughter as to both counts. The trial court merged the two convictions and, after a sentencing hearing, sentenced the Defendant to fifteen years in the Tennessee Department of Correction. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant asserts that the trial court erred when it: (1) denied his request for a continuance to secure a material witness to the case; (2) denied his request for a jury instruction on ignorance and mistake of fact; and (3) sentenced him as a Persistent, Range III offender.

## A. Jury Instruction

The Defendant asserts that the trial court erred by denying the Defendant's request to instruct the jury as to ignorance or mistake of fact. The State responds that the facts presented at trial did not warrant this instruction and, thus, that the trial court did not err in refusing to give this instruction to the jury. The trial court, in its order denying the request for the jury instruction, stated:

> In this case, the Defendant alleges that the "fact" about which he was mistaken was the identity of the victim, who was wearing a motorcycle helmet at the time. Defendant believed the victim to be a different person. The "mistake" in this matter does not negate the culpable mental state of the Defendant.

A trial court has a "duty to give a complete charge of the law applicable to the facts of the case." *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). Anything short of a complete charge denies a defendant his constitutional right to trial by a jury. *State v. McAfee*, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987). However, Tennessee law does not mandate that any particular jury instructions be given so long as the trial court gives a complete charge on the applicable law. *See State v. West*, 844 S.W.2d 144, 151 (Tenn. 1992). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977)). In determining whether jury instructions are erroneous, this court must review the charge in its entirety and invalidate the charge only if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998). Because questions of the propriety of jury instructions are mixed questions of law and fact, this Court's review is de novo, with no presumption of correctness. *See State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001).

"In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." *State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001) (citing *Johnson v. State*, 531 S.W.2d 558, 559 (Tenn. 1975); *State v. Bult*, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998)). The trial judge does not err when it denies an

inaccurate or inapplicable instruction to the case when the charge, in its entirety, "fully and fairly sets out the applicable law." *Id*. (citing *State v. Bohanan*, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987)).

"[I]gnorance or mistake of fact is a defense to prosecution if such ignorance or mistake negates the culpable mental state of the charged offense." T.C.A. § 39-11-502(a) (2009). The trial court must instruct the jury on the defense if it is fairly raised by the proof. T.C.A. § 39-11-203(a), (c) (2009). The Sentencing Commission Comments provide that ignorance or mistake of fact "is a narrow defense." T.C.A. § 39-11-502, Sentencing Comm'n Comments. The Defendant was charged with first degree murder and felony murder, which both require, in this case, a "premeditated and intentional killing of another" and he was convicted of the lesser-included offense of voluntary manslaughter, which requires the intentional and knowing killing of another. T.C.A. § 39-13-211 (2009).

Our Supreme Court addressed the issue of whether a defendant who kills an unintended victim meets the culpable mental state for first degree murder:

> The legislature has broadly defined an "intentional" act as: "a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or *desire to engage in the conduct or cause the result*." Tenn. Code Ann. § 39-11-302(a) (1991) (emphasis added). A plain reading of this statute as applied to first degree murder indicates that a defendant's conscious objective need not be to kill a specific victim. Rather, the statute simply requires proof that the defendant's conscious objective was to kill a person, i.e., "cause the result." In short, if the evidence demonstrates that the defendant intended to "cause the result," the death of a person, and that he did so with premeditation and deliberation, then the killing of another, even if not the intended victim (i.e., intended result), is first degree murder.

*Millen v. State*, 988 S.W.2d 164, 168 (Tenn. 1999).

We agree with the trial court that the Defendant's shooting of an unintended victim does not negate the culpable mental state required for first degree murder or felony murder. The circumstances of this case are certainly tragic, but the Defendant admitted he intended to shoot the shotgun at the motorcycle. Before the shooting, the Defendant called Lafevers to request more shotgun shells and loaded the weapon upon receipt of the additional shells. When he heard a motorcycle approaching, the Defendant picked up his shotgun, went outside, and shot the motorcycle rider. The Defendant never asserted that he did not intend to shoot; he asserted only that he believed the motorcycle rider was Hill rather than his friend, the victim. Based

-12-

upon this evidence, we conclude that the trial court did not err in declining to submit an ignorance or mistake of fact instruction to the jury. The Defendant is not entitled to relief as to this issue.

## B. Continuance

The Defendant next contends that the trial court erred in failing to grant a continuance of the trial in order to allow the Defendant to locate a material witness, Dan Hill. The State counters that the trial court did not err in denying a continuance on the morning of trial because there is no proof in the record the Defendant filed the required affidavit in support of his motion and the Defendant failed to establish: (1) that Hill's testimony would have been relevant or material; and (2) that he exercised due diligence in attempting to locate Hill.

The decision of whether to grant a continuance is one within the sound discretion of the trial court, which will not be overturned absent a clear showing of abuse of discretion that resulted in prejudice to the defendant. *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004); *State v. Russell*, 10 S.W.3d 270, 275 (Tenn. Crim. App .1999). "An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied [a] defendant a fair trial or that it could be reasonably concluded that a different result would have . . . followed had the continuance been granted." *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995). "In order to establish an abuse of discretion, the complaining party must make a clear showing of prejudice as a result of the continuance being denied." *Russell*, 10 S.W.3d at 275 (citing *State v. Teel*, 793 S.W.2d 236, 245 (Tenn. 1990)).

This Court has previously addressed the issue of what is required when a defendant requests a continuance based upon a missing witness:

> When requesting a continuance to accommodate a missing witness, the grounds must be set out in an affidavit which alleges (a) the substance of the facts the defendant expects to prove through the unavailable witness; (b) sufficient facts to establish the relevance and materiality of the testimony; (c) the admissibility of the testimony, if the witness was available; (d) the non-cumulative nature of the testimony; (e) the witness' availability at a later date; and (f) due diligence in attempting to obtain the presence of the witness. *State v. Dykes*, 803 S.W.2d 250, 256-57 (Tenn. Crim. App. 1990); Tenn. Code Ann. § 19-1-110(a). Failure to file the motion in proper form may be a ground for denial. *State v. Dykes*, 803 S.W.2d at 257.

*State v. Zirkle*, 910 S.W.2d 874, 884 (Tenn. Crim. App. 1995)

The Defendant made an oral motion to the court the morning of trial explaining that Hill's subpoena had not been served and it was the defense counsel's belief that Hill was evading service. Further, defense counsel said that his legal assistant "was put on notice that if she went to [Hill's] residence, her life would be in peril." Defense Counsel explained that because the defense theory was that the Defendant was under a mistake of fact that the driver of the motorcycle was Hill rather than the victim, Hill was material in that the jury needed to see that Hill was comparable in size and weight to the victim. The trial court first noted that, in the year following this incident, the Defendant had made no efforts to secure Hill's presence at the trial until ten days prior to trial. The trial court further noted that the defense did not contend that Hill was present during the shooting. The trial court concluded that Hill was not a material witness and denied the Defendant's oral motion for a continuance. The trial court did, however, issue multiple bench warrants at the Defendant's request and monitored the attempts at service through the court clerk.

The State correctly notes that the record does not contain an affidavit in support of the Defendant's motion for a continuance. As we earlier stated, this alone is sufficient grounds upon which to deny a motion for continuance. Nonetheless, based upon the record before us we will address the Defendant's complaint in light of the aforementioned factors. In doing so, we rely solely on the transcript because the record does not contain a written motion for a continuance or an affidavit in support thereof.

At the hearing on the Defendant's motion for a continuance, the Defendant's attorney stated that Hill's testimony was necessary to show that his height and weight was similar to the victim's height and weight, which would prove that the Defendant was genuinely mistaken in identifying the motorcycle rider as Hill. We conclude that the Defendant has not proven that the trial court abused its discretion by denying his motion for continuance based upon a missing witness because he has not alleged the "materiality" of Hill's expected testimony and the "non-cumulative nature" of Hill's expected testimony. *See Zirkle*, 910 S.W.2d at 884. Lafevers, with knowledge of both the victim and Hill, testified the men were of similar height. The Defendant testified that he believed the motorcycle rider to be Hill. Rideout and Lafevers, who were both present during the shooting, testified that they believed the motorcycle rider to be Hill. The investigating officer testified that he found no evidence contradictory to the Defendant's statement that he believed the motorcycle rider to be Hill. The fact that the Defendant believed the motorcycle rider to be someone other than the victim is well-established in the record.

Further, the Defendant has also not alleged that Hill would be available at a later date. *Zirker*, 910 S.W.2d at 884. The investigating officer testified that he had never been able to make contact with Hill for an interview during his investigation or in relation to a subpoena issued for the trial. McClusky, an Alabama sheriff's deputy, also testified that as recently as

the day prior to his testimony he was unable to locate Hill. Neither the Defendant's attorney nor the State had made contact with Hill at any point during the year following the shooting to the trial date. The Defendant is not entitled to relief on this issue.

## C. Sentencing

The Defendant contends that two of the five convictions used to classify him as a Persistent, Range III offender were committed within twenty-four hours of each other and, therefore, should have been considered one conviction for the purpose of determining his offender status. *See* Tenn. Code Ann. § 40-35-107(b)(4). The State responds that the trial court properly sentenced the Defendant as a Persistent, Range III offender because the two convictions that occurred within the same twenty-four hour period both involved the risk of bodily injury to other persons, thus excluding the convictions from a merger requirement. *Id.*

When a defendant challenges the length, range or manner of service of a sentence, this Court must conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2009). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts (2009). This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the Sentencing Act, the appellate court may not disturb the sentence even if a different result was preferred. T.C.A. § 40-35-103 (2009); *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

In sentencing a defendant, the trial court must first determine the appropriate offender status based upon a defendant's prior criminal record. *See* T.C.A. § 40-35-104 to -109. The court then determines the appropriate range to establish the minimum and maximum sentence available. *See id*. In this case, the Defendant is convicted of a Class C felony. In order to qualify as a persistent offender, he must have at least five prior felony convictions. Tennessee Code Annotated section 40-35-107(b)(4), otherwise referred to as the "twenty-four hour merger rule," provides as follows:

> Except for convictions for which the statutory elements include serious bodily injury, bodily injury, threatened serious bodily injury, or threatened bodily injury to the victim or victims, convictions for multiple felonies committed within the

same twenty-four-hour period constitute one (1) conviction for the purpose of determining prior convictions.

The trial court found that the Defendant had four Class E felony convictions and one Class D felony conviction for a total of five prior felony convictions. The trial court acknowledged that the convictions for reckless endangerment and evading arrest both occurred on the same date, April 24, 2001. The trial court, however, found that the two offenses did not merge and sentenced the Defendant as a persistent offender.

A conviction for a Class E felony reckless endangerment requires a person to recklessly engage "in conduct [with a weapon] that places or may place another person in imminent danger of death or *serious bodily injury*." T.C.A. § 39-13-103 (emphasis added). A Class D evading arrest conviction requires that a person, while driving a car, "intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop" and by doing so "create[] a *risk of death or injury* to innocent bystanders or other third parties. T.C.A. § 39-13-103 (emphasis added).

We agree with the trial court's finding that the merger rule does not apply in this case because both convictions contain an element of risk of injury or serious bodily injury. The Defendant asserts that, because the merger statute refers to injury or risk of injury to the "victim" and the elements for his convictions do not specifically refer to "victims" but instead "another person" or "innocent bystanders or other third parties," the merger rule is inapplicable. In our view, the difference between the use of the term "victim" versus "another person" to identify the person or persons the Defendant harmed or placed at risk of harm is not significant. The terms used in the reckless endangerment and evading arrest statutes that refer to persons harmed or at risk of harm are within the scope of "victim" as used in the merger rule statute. Thus, we are not persuaded by the Defendant's attempt to distinguish the language of the merger rule exception from that of the definitions of his prior offenses. The Defendant is not entitled to relief as to this issue.

### III. Conclusion

Based upon the foregoing and the record as a whole, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE